ALP Sys., Inc. v. Haygood, 2021 NCBC 9.

STATE OF NORTH CAROLINA

BUNCOMBE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
20 CVS 1380

ALP SYSTEMS, INC.; and STACY
BEAN,

           Plaintiffs,

v.

DALE RICHARD HAYGOOD;
BRANDEN D. BRYSON; KYLE
JAMES LEONARD; and BOLTED
LIGHTNING PROTECTION, LLC,

           Defendants.

**ORDER AND OPINION ON
DEFENDANT BOLTED LIGHTNING
PROTECTION, LLC'S
RENEWED MOTION TO DISMISS
PURSUANT TO RULE 12(b)(2)**

1. **THIS MATTER** is before the Court on Defendant Bolted Lightning Protection, LLC's ("Bolted") Renewed Motion to Dismiss (the "Motion to Dismiss"). (Mot. to Dismiss, ECF No. 24.) Bolted moves for dismissal of Plaintiff ALP Systems, Inc.'s ("ALP") claims against Bolted pursuant to Rule 12(b)(2) of the North Carolina Rules of Civil Procedure (the "Rule(s)"). Alternatively, Bolted moves for dismissal of ALP's claims pursuant to Rule 12(b)(6).

2. For the reasons set forth in this Order and Opinion, the Court **DENIES** the Motion to Dismiss to the extent that it seeks dismissal of ALP's claims pursuant to Rule 12(b)(2). The Court will enter a separate order and opinion addressing Bolted's Rule 12(b)(6) challenge.

> *Hyler & Lopez, P.A., by George B. Hyler, Jr. and Stephen P. Agan, for Plaintiff ALP Systems, Inc.*
>
> *Roberts & Stevens, P.A., by John D. Noor, for Defendant Bolted Lightning Protection, LLC.*

Robinson, Judge.

# I.   BACKGROUND

3.     ALP and Plaintiff Stacy Bean ("Bean") (together, "Plaintiffs") initiated this action upon filing their Complaint on April 13, 2020.  (Compl., ECF No. 4.)  On April 22, 2020, Plaintiffs filed their Amended Complaint.  (Am. Compl., ECF No. 12.)

4.     ALP has asserted several claims against Bolted and Defendants Dale Richard Haygood ("Haygood"), Branden D. Bryson ("Bryson"), and Kyle James Leonard ("Leonard").  (Am. Compl. ¶¶ 96–161, 164–88.)  Bean has brought a claim against Leonard requesting the entry of a no-contact order.  (Am. Compl. ¶¶ 162–63.)  Iain P. King ("King") was a named defendant in this action until ALP filed a Notice of Voluntary Dismissal on August 26, 2020 voluntarily dismissing without prejudice all its claims against him.  (ECF No. 50.)

5.     ALP's claims against Bolted arise from allegations that Bolted (a) tortiously interfered with non-compete/non-disclosure employment contracts previously entered into by ALP and the three individual defendants; (b) tortiously interfered with ALP's existing and prospective contracts with its customers; (c) misappropriated certain trade secrets of ALP; and (d) engaged in unfair methods of competition.  (Am. Compl. ¶¶ 164–88.)

6.     This action was designated to the North Carolina Business Court by Order of the Chief Justice of the North Carolina Supreme Court on May 1, 2020, (ECF No. 1), and assigned to the undersigned by Order of the Chief Business Court Judge on May 4, 2020, (ECF No. 2).

7.     On May 29, 2020, Bolted and King (before he was voluntarily dismissed from the action) filed the Motion to Dismiss, along with a supporting brief and an affidavit executed by King, asserting that ALP's claims against Bolted should be dismissed for lack of personal jurisdiction pursuant to Rule 12(b)(2) or, alternatively, for failure to state a claim pursuant to Rule 12(b)(6).  (Mot. to Dismiss; King Aff., ECF No. 25; Br. in Supp., ECF No. 26.)

8.     On June 26, 2020, the Court, upon a motion by ALP, entered an order extending ALP's deadline for responding to the Motion to Dismiss and permitting ALP to conduct jurisdictional discovery.  (ECF No. 36.)

9.     On September 10, 2020, ALP filed separate briefs opposing the Motion to Dismiss, with one brief addressing Bolted's Rule 12(b)(2) arguments and the other one addressing Bolted's Rule 12(b)(6) arguments.  (Br. in Opp'n to Rule 12(b)(2) Mot., ECF No. 59; Br. in Opp'n to Rule 12(b)(6) Mot., ECF No. 60.)  Along with its brief in opposition to Bolted's Rule 12(b)(2) challenge, ALP submitted an affidavit executed by Eric J. Bean (ALP's president), deposition testimony, written discovery responses, and other documentary evidence.  (Index to Exs., ECF No. 59.1.)

10.     After full briefing on the Motion to Dismiss, the Court held a hearing on the Motion on October 29, 2020 (the "October 29 Hearing"), (ECF No. 74), at which all parties were represented by counsel, with the exception of Haygood, who is currently proceeding *pro se* in this action.  The Motion to Dismiss is now ripe for resolution.

## II. LEGAL STANDARD

11. When a defendant moves to dismiss a complaint under Rule 12(b)(2) for lack of personal jurisdiction, the plaintiff carries the burden of establishing that the trial court has personal jurisdiction over the defendant. *See Bauer v. Douglas Aquatics, Inc.*, 207 N.C. App. 65, 68 (2010).

12. "The standard of review to be applied by a trial court in deciding a motion under Rule 12(b)(2) depends upon the procedural context confronting the court." *Banc of Am. Sec. LLC v. Evergreen Int'l Aviation, Inc.*, 169 N.C. App. 690, 693 (2005). If the trial court considers affidavits and other documentary evidence submitted by the parties in support of and in opposition to the Rule 12(b)(2) motion and also holds a hearing on the motion, the court should act as a fact-finder and determine whether the plaintiff has established personal jurisdiction by a preponderance of the evidence. *See Deer Corp. v. Carter*, 177 N.C. App. 314, 322 (2006); *see also Soma Tech., Inc. v. Dalamagas*, 2017 NCBC LEXIS 26, at *8–9 (N.C. Super. Ct. Mar. 24, 2017) (acting as a fact-finder and deciding the personal jurisdiction issue by a preponderance of the evidence, where the court considered the evidence submitted by each party and held a non-evidentiary hearing on the Rule 12(b)(2) motion).

13. "Once a defendant submits an affidavit or evidence challenging personal jurisdiction, unverified allegations in a complaint conflicting with that evidence may no longer be taken as true," though "allegations in [the] complaint uncontroverted by [the evidence] are still taken as true." *Weisman v. Blue Mt. Organics Distrib., LLC*,

2014 NCBC LEXIS 41, at *2 (N.C. Super. Ct. Sept. 5, 2014) (citing *Banc of Am. Sec.*, 169 N.C. App. at 693–94).

14. Having considered the evidence submitted by the parties, the uncontroverted allegations in the Amended Complaint, the parties' briefs, and the oral arguments of counsel made during the October 29 Hearing, the Court makes the following findings of fact and conclusions of law for the sole purpose of determining whether ALP has established by a preponderance of the evidence that the Court has personal jurisdiction over Bolted.[1]

### III. FINDINGS OF FACT[2]

15. ALP is a corporation organized and existing under the laws of North Carolina that designs and installs lightning protection systems for residential and commercial buildings and conducts technical presentations and educational seminars for its customers. (Am. Comp. ¶¶ 1, 10.) ALP's principal place of business is located in North Carolina. (Am. Comp. ¶ 1.)

16. Haygood, Leonard, and Bryson are residents of North Carolina and former employees of ALP. (Haygood Dep. 9–10, ECF No. 59.3; Leonard Dep. 7–9, ECF No. 59.4; Am. Compl. ¶ 5; Bean Aff. ¶ 56, ECF No. 59.2.)

---

[1] These findings of fact and conclusions of law shall not be binding on the Court in subsequent orders or on the parties at a trial on the merits.

[2] To the extent that any of these findings of fact are more properly considered conclusions of law, the Court intends for them to be considered as such. *See, e.g., Sheffer v. Rardin*, 208 N.C. App. 620, 624 (2010) ("Where findings of fact should have been more properly designated conclusions of law, the [appellate court] will treat them as such for the purposes of appeal." (internal quotation marks, alterations, and citation omitted)).

17. Bolted is a limited liability company ("LLC") organized and existing under the laws of Florida that sells and provides lightning protection products and services. (King Aff. ¶¶ 12, 14; Haygood Dep. Ex. 1.) Bolted's principal place of business is located in Florida. (King Aff. ¶ 13.) Bolted does not have offices in North Carolina, it does not maintain financial accounts in North Carolina, it does not own real property in North Carolina, and it has not paid income taxes in North Carolina. (King Aff. ¶¶ 16, 20–22.)

18. King is a resident of Florida and Bolted's sole member-manager. (King Aff. ¶¶ 2, 12.)

19. King was previously an employee of Surge Suppression, LLC ("Surge"), a Florida-based company that supplies surge protection devices. (Bean Aff. ¶ 3.) ALP became a customer of Surge in 2015, and over the years, King and Haygood, an employee of ALP at the time, developed a working relationship. (Bean Aff. ¶¶ 3–8.)

20. Haygood's name and Waynesville, North Carolina residence were listed on Bolted's original Articles of Organization filed with the state of Florida in June 2019, identifying him as Bolted's manager. (Haygood Dep. Ex. 1.) However, King later filed Articles of Amendment in July 2019 that removed Haygood's name from Bolted's Articles of Organization. (King Aff. ¶ 12; Am. Comp. Ex. 4.) King's stated reason for filing the Articles of Amendment, as confirmed by Haygood, is that King mistakenly listed Haygood as Bolted's manager on the Articles of Organization. (King Aff. ¶ 12; Haygood Dep. 10:16–11:19.)

21.     Haygood began working for Bolted in June 2019 and continued working for the company in 2020.  (Haygood Dep. 10:7–10, 50:25–52:11, Ex. 24; South East Personnel Leasing, Inc.'s ["SEPL"] Resps. 13, 15, 18, ECF No. 59.8.)

22.     Haygood performed work for Bolted in connection with several of its commercial projects, including projects in (a) Mascot, Tennessee for North American Roofing (the "Mascot Project"); (b) Nashville, Tennessee for Bass Pro Shops (the "Nashville Project"); (c) Panama City, Florida for Florida State University (the "Panama City Project"); and (d) South Korea for the United States Army Garrison Humphreys (the "South Korea Project").  (Haygood Dep. 16:6–17:19, 31:9–20, 32:14–22, 58:16–22, 71:10–72:6, 91:21–93:4, Exs. 5, 20, 31.)

23.     At his North Carolina residence, Haygood prepared project quotes, purchase orders, material lists, an instruction manual, and a company resume, all for Bolted.  (Haygood Dep. 19:21–20:16, 26:11–28:14, 29:3–7, 33:11–34:6, 41:7–42:18, 43:13–25, 51:19–52:11, 56:2–14, 60:20–61:5.)

24.     Between July 2019 and January 2020, King and Haygood communicated regularly through phone calls, emails, and text messages about matters concerning Bolted's business, including the work that Haygood performed for Bolted.  (Haygood Dep. 11:22–14:7, 16:6–22:19, 24:13–30:24, 33:11–34:15, 37:2–38:20, 41:7–46:4, 50:25–52:11, 57:12–19, Exs. 2, 5–7, 9–13, 16, 18–21, 24, 29.)  Haygood testified during his deposition that, when some of these communications took place, King was aware that Haygood was present in North Carolina at the time. (Haygood Dep. 19:9–21:1, 33:11–34:15.)

25. On one occasion, King ordered materials for the Mascot Project and had them delivered to Haygood's North Carolina residence. (Haygood Dep. 19:9–20:11, Ex. 6.) Thereafter, Haygood, with Bolted's approval, ordered materials for the Mascot Project and had them delivered to his North Carolina residence. (Haygood Dep. 54:4–56:14, Exs. 26–28.)

26. Bolted also mailed pay stubs and payments for work-related expenses to Haygood's North Carolina residence. (Haygood Dep. 47:11–48:21, Ex. 22.)

27. Leonard began working for Bolted in July 2019 and continued working for the company in 2020. (Leonard Dep. 9:23–10:12, 74:15–76:1; SEPL's Resps. 14–16, 19.)

28. Leonard primarily worked as a laborer for Bolted and was involved with the Mascot Project, the Nashville Project, the Panama City Project, and the South Korea Project. (Leonard Dep. 10:22–11:7, 75:14–19.) Leonard also completed an inspection report on the South Korea Project for Bolted. (Leonard Dep. 39:22–41:12.)

29. King and Leonard sometimes communicated through phone calls, emails, and text messages about matters regarding Bolted's business, including Leonard's work for Bolted, though Leonard's main point of contact for these matters was Haygood. (Leonard Dep. 14–27, 75:5–76:1.) At times, Leonard was present in North Carolina when he communicated with King. (Leonard Dep. 22:7–23:4.)

30. For the Mascot Project, both King and Haygood ordered materials and had them delivered to a shop owned by Leonard in Clyde, North Carolina. (Leonard Dep.

19:23–20:22, Ex. 6.) The materials were stored in Leonard's shop until they were needed for the job. (Leonard Dep. 60:23–63:22, 94:24–95:13.)

31. Bolted also mailed to Leonard in North Carolina payments for work-related expenses, which Leonard received. (Leonard Dep. 13:9–14:5, 26:1–5.)

32. Bryson began working for Bolted in August 2019. (Haygood Dep. 31:9–13, Ex. 12A.) While he was present in North Carolina, Bryson reviewed drawings for the South Korea Project. (Haygood Dep. 31:9–33:8.)

33. Bolted paid B&H Drafting & Design LLC ("B&H"), a North Carolina LLC formed by Bryson and Haygood, for the work that Bryson performed for Bolted. (Haygood Dep. 47:11–22, 81:13–82:6, 95:11; Articles of Organization of B&H, ECF No. 59.10.) More than 90% of B&H's revenue came from this work. (Bryson's Resps. to Disc. Requests 2, 9, ECF No. 59.9.)

34. Bryson also served as a reference on Bolted's certification application to the Lightning Protection Institute, and he also reviewed a company resume and a draft training manual for Bolted. (Haygood Dep. 21:14–22:9, 34:18–35:3, 41:7–42:1.)

35. In July 2019, King emailed a safety manual to Haygood and Leonard, asking them to sign and return the manual back to King. (Bean Aff. Ex. 14.) ALP contends this safety manual is identical to one used by ALP in its business. (Br. in Opp'n to Rule 12(b)(2) Mot. 7.)

## IV. CONCLUSIONS OF LAW

36. North Carolina courts engage in a "two-step analysis" to determine whether they have personal jurisdiction over a defendant. *Beem USA Ltd.- Liab. Ltd. P'ship*

*v. Grax Consulting*, LLC, 373 N.C. 297, 302 (2020). "First, jurisdiction over the defendant must be authorized by N.C.G.S. § 1-75.4—North Carolina's long-arm statute." *Beem,* 373 N.C. at 302. "Second, if the long-arm statute permits consideration of the action, exercise of jurisdiction must not violate the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution." *Id.* (citation and internal quotation marks omitted).

37.    Bolted does not dispute that jurisdiction is authorized in this case by section 1-75.4, acknowledging instead that "this Court is only required to determine whether sufficient minimum contacts exist between Bolted and North Carolina." (Reply Br. ¶ 10, ECF No. 72.) Accordingly, the Court will focus its analysis on the due process prong of the personal jurisdiction inquiry. *See, e.g.*, *Capitala Grp., LLC v. Columbus Advisory Grp. LTD*, 2018 NCBC LEXIS 183, at \*9 (N.C. Super. Ct. Dec. 3, 2018) ("In most cases, the analysis collapses into one inquiry because the North Carolina Supreme Court has construed section 1-75.4 liberally 'to make available to the North Carolina courts the full jurisdictional powers permissible under federal due process.'" (quoting *Dillon v. Numismatic Funding Corp.*, 291 N.C. 674, 676 (1977))).

A.  Due Process

38.    The Due Process Clause limits the personal jurisdiction of state courts by requiring that a defendant "have certain minimum contacts with [the forum state] such that the maintenance of the suit [in that state] does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

39.     The United States Supreme Court has recognized two types of personal jurisdiction in its decisions concerning the minimum contacts requirement: general jurisdiction and specific jurisdiction. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *Beem*, 373 N.C. at 303. Although ALP does not specify in its brief what form of personal jurisdiction it contends exists here, ALP's counsel argued during the October 29 Hearing that the Court can exercise both general and specific jurisdiction over Bolted.

i.     *General Jurisdiction*

40.     The Court will first address whether it has general jurisdiction over Bolted. General jurisdiction exists when the defendant's contacts "are so 'continuous and systematic' as to render [it] essentially at home in the forum [s]tate." *Goodyear*, 564 U.S. at 919 (quoting *Int'l Shoe*, 326 U.S. at 317). "[O]nly a limited set of affiliations with a forum will render a defendant amenable to [general] jurisdiction there." *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014); *see also Worley v. Moore*, 2017 NCBC LEXIS 15, at *21–22 (N.C. Super. Ct. Feb. 28, 2017) ("The level of minimum contacts required to support general jurisdiction is significantly higher than that required to support specific jurisdiction." (citing *Cambridge Homes of N.C. L.P. v. Hyundai Constr., Inc.*, 194 N.C. App. 407, 412 (2008))). A court with general jurisdiction can adjudicate "any and all claims against" the defendant. *Daimler*, 571 U.S. at 137.

41.     Based on the evidence submitted by the parties, the Court concludes that it cannot exercise general jurisdiction over Bolted. To begin with, Bolted is an LLC

organized and existing under the laws of Florida with its principal place of business also located in Florida. *Cf. id.* (explaining that, for general jurisdiction, a corporation is "fairly regarded at home" at "its place of incorporation and principal place of business"). Moreover, Bolted does not have any North Carolina offices, nor does it maintain any financial accounts, own any real property, or pay any income taxes in North Carolina. Simply put, there is no reasonable basis for concluding that Bolted is at home in this State.

ii. *Specific Jurisdiction*

42. The Court now turns to specific jurisdiction. Unlike general jurisdiction, specific jurisdiction "focuses on the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (citation and internal quotation marks omitted). As a result, specific jurisdiction requires some connection between the forum state and the underlying action such that "the suit arises out of or relates to the defendant's contacts with the forum." *Daimler*, 571 U.S. at 127 (alterations, citation, and internal quotation marks omitted).

43. Specific jurisdiction cannot be based on "a defendant's 'random, fortuitous, or attenuated' contacts with the forum state." *Beem*, 373 N.C. at 303 (quoting *Walden*, 571 U.S. at 286). Instead, there must be "some act by which the defendant purposefully avail[ed] itself of the privilege of conducting activities within the forum [s]tate, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). In that regard, a "defendant's contacts with the forum state must be such that a defendant 'should reasonably anticipate being haled into court

there.'" *Beem*, 373 N.C. at 303 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

44. In addition, the exercise of specific jurisdiction must be reasonable under the circumstances. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476–78 (1985). Factors used to evaluate reasonableness include "the burden on the defendant, the forum [s]tate's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several [s]tates in furthering fundamental substantive social policies." *Id.* at 477 (citation and internal quotation marks omitted).

45. With these principles in mind and having considered the evidence, the Court concludes that Bolted has had sufficient minimum contacts with North Carolina to satisfy the due process requirements of specific jurisdiction.

46. As the evidence shows, almost immediately after its formation, Bolted reached outside of Florida and into North Carolina by directly engaging persons and an entity located in North Carolina. Haygood and Leonard, in particular, worked on many of Bolted's commercial projects in 2019 and 2020. King—acting on behalf of Bolted as the entity's sole member-manager—also had direct dealings with Haygood and Leonard, sometimes while they were located in North Carolina, in connection with the work they performed for Bolted. And although the record does not reflect any direct interactions between Bryson and King, Bryson nonetheless reviewed drawings for one of Bolted's projects, while he was located in North Carolina, as well

as internal documents related to Bolted's business. Moreover, Bolted compensated Bryson's North Carolina based company, B&H, for the work he performed for Bolted, with more than 90% of B&H's revenue coming from Bolted-related work. Bryson also served as Bolted's reference on a certification application.

47. In short, Bolted created an extensive, ongoing business relationship with three North Carolina residents (Haygood, Leonard, and Bryson) and a North Carolina company (B&H), thereby initiating contact with North Carolina. In doing so, Bolted not only purposefully availed itself of the privilege of conducting activities within North Carolina, but it also had reason to expect that it might be subjected to litigation in this State. *See Burger King*, 471 U.S. at 475–76 (explaining that a defendant "has availed himself of the privilege of conducting business" in the forum state when the defendant "has created 'continuing obligations' between himself and residents of the forum" (citation omitted)); *Beem*, 373 N.C. at 306 (concluding that a South Carolina LLC "established an ongoing relationship with persons and entities located within [North Carolina] such that it could reasonably anticipate being called into court here").

48. Bolted also had contact with North Carolina through more specific means. For example, in connection with the work that Haygood and Leonard performed for Bolted, Bolted mailed pay stubs and payments for work-related expenses to Haygood and Leonard in North Carolina. In addition, Haygood, with Bolted's approval, arranged for work materials for the Mascot Project to be delivered to both Haygood and Leonard in North Carolina, and in some instances, King himself

arranged for materials to be delivered to Haygood's residence and to Leonard's shop in North Carolina, where they were stored until they were needed. Haygood's deposition testimony also reflects that, while he was present in North Carolina, he and King communicated with each other frequently by phone and email about Bolted's business and that King was aware that Haygood was in North Carolina when some of these communications took place.

49. Both the United States Supreme Court and the North Carolina Supreme Court have treated conduct similar to that by Bolted and King as evidence of minimum contacts with the forum state. Indeed, in a recent case dealing with the minimum contacts required for specific jurisdiction, the United States Supreme Court explained that "physical entry into the [forum state]—either by the defendant in person or through an agent, *goods, mail, or some other means*—is certainly a relevant contact." *Walden*, 571 U.S. at 285 (emphasis added). The North Carolina Supreme Court also recently held that our courts could exercise specific jurisdiction over a South Carolina LLC based, in part, on the fact that the LLC's owner had contacted one of the plaintiffs, who resided in North Carolina, through various emails, texts, and phone calls and had sent mail to the plaintiff's North Carolina residence. *See Beem*, 373 N.C. at 298–99, 306.

50. Having determined that Bolted had several contacts with North Carolina, the Court will now assess whether those contacts are connected to the underlying controversy in this action. Bolted argues that any contacts that it may have had with

North Carolina "have nothing to do" with ALP's claims against Bolted. (Reply. Br. ¶ 13.) The Court disagrees.

51. Bolted's contacts with North Carolina include forming an ongoing business relationship with Haygood, Leonard, and Bryson. As part of this business arrangement, Haygood, Leonard, and Bryson performed work for Bolted on the Mascot Project, the Nashville Project, the Panama City Project, and the South Korea Project. Thus, ALP's tortious interference claim against Bolted arises out of Bolted's contacts with North Carolina because ALP alleges (a) that Bolted, by hiring Haygood, Leonard, and Bryson, tortiously interfered with the non-compete/non-disclosure employment contracts between ALP and these three individual defendants and (b) that Bolted tortiously interfered with ALP's existing and prospective contracts with its customers, including the customers involved with the Mascot Project, the Nashville Project, the Panama City Project, and the South Korea Project. (*See* Am. Compl. ¶¶ 164–76.)

52. Likewise, ALP's misappropriation of trade secrets claim against Bolted relates to Bolted's contacts with our State. One of the core allegations regarding this claim is that Bolted misappropriated ALP's safety manual, an alleged trade secret of ALP, (*see* Am. Compl. ¶¶ 73, 178), and there is evidence in the record showing that, after Bolted engaged Haygood and Leonard, two North Carolina residents, to work for the company, King emailed a copy of Bolted's safety manual to Leonard and Haygood, which ALP contends is identical to ALP's safety manual. (Br. in Opp'n to Rule 12(b)(2) Mot. ¶ 7.) As a result, because ALP claims, in part, that Bolted has

misappropriated ALP's safety manual by using a safety manual identical to ALP's manual, which ALP alleges was provided to Bolted by Bryson and/or Haygood without ALP's consent, there is a sufficient nexus between ALP's misappropriation of trade secrets claim against Bolted and Bolted's contacts with North Carolina. (*See* Am. Compl. ¶¶ 73, 177–82.)

53. And since ALP's unfair methods of competition claim against Bolted is based on the same alleged misconduct that forms the basis for ALP's tortious interference and misappropriation of trade secrets claims against Bolted, the unfair methods of competition claim also arises out of or relates to Bolted's contacts with North Carolina. (*See* Am. Compl. ¶¶ 183–88.)

54. Lastly, the Court will consider the reasonableness of exercising specific jurisdiction over Bolted. Although Bolted concedes that North Carolina courts have an interest in adjudicating this litigation, Bolted nevertheless argues that the ongoing COVID-19 pandemic weighs against requiring Bolted to litigate this case in North Carolina. (Br. in Supp. ¶ 19.) The Court understands that Bolted may have concerns relating to the pandemic. However, in this case, Bolted has not demonstrated that it will experience the type of burden that warrants dismissing ALP's claims against Bolted, particularly in light of the fact that the parties conducted jurisdictional discovery in the midst of the pandemic.

55. In sum, the Court finds and concludes that ALP has met its burden of establishing that the Court has personal jurisdiction over Bolted by a preponderance of the evidence.

## V.    CONCLUSION

56.    For the foregoing reasons, the Court hereby **DENIES** the Motion to Dismiss to the extent that it requests dismissal of ALP's claims against Bolted for lack of personal jurisdiction.

**SO ORDERED**, this the 9th day of February, 2021.


/s/ Michael L. Robinson
Michael L. Robinson
Special Superior Court Judge
  for Complex Business Cases